RECEIVED
IN LAKE CHARLES, LA

FEB 23 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **GEORGE CARROLL, ET AL.** | : | **DOCKET NO. 2:05cv 0307** |
| **VS.** | : | **JUDGE MINALDI** |
| **PRAXAIR, INC.** | : | **MAGISTRATE JUDGE WILSON** |

**MEMORANDUM RULING**

Again before the court is a Motion in Limine to Exclude Unreliable Expert Testimony [doc. 35] filed by Praxair, Inc. ("Praxair"). The motion was initially taken up by the court at a hearing on September 20, 2006. At that time, the court determined that there was insufficient information to rule on the motion and ordered the parties to take additional depositions of plaintiff George Carroll's treating physicians.[1] The parties have since taken the depositions and submitted supplemental memoranda.

**BACKGROUND**

On March 20, 2004, the plaintiff, George Carroll, was delivering liquid nitrogen to the Praxair facility in Westlake, Louisiana, while in the course and scope of his employment as a truck driver with Messer Griesheim Industries. While unloading his truck at the defendant's facility, Carroll was exposed to carbon monoxide (CO). He was subsequently found unconscious and face-down near his truck and taken by ambulance to the emergency room at Christus St. Patrick Hospital

---

[1] *See* Sept. 20, 2006 Min. Entry [doc. 54].

in Lake Charles.

Carroll's exposure to CO is alleged to have caused significant and numerous injuries to his respiratory and nervous systems. Among the medical conditions Carroll relates to his CO exposure are Type II diabetes and peripheral neuropathy.

On September 15, 2006, Praxair filed the instant motion initially seeking to exclude any expert testimony which suggests that CO exposure caused diabetes or peripheral neuropathy. After taking additional, court-ordered depositions, Praxair maintains that there is no causal connection between the plaintiff's CO exposure and peripheral neuropathy. In addition, Praxair now asserts that the depositions establish that there is no causal connection between CO exposure and the following, chronic medical conditions: toxic encephalopathy; permanent injury to the heart, lungs, or kidneys; significant neurocognitive disorders; dyspnea; restrictive lung disease; obstructive lung disease; obstructive sleep apnea; sinus problems; and blurred vision.[2] Thus, Praxair seeks to extend their *Daubert* motion to include testimony regarding these medical conditions.

The plaintiffs argue that Praxair's own expert neurologist, Dr. Sconzert, offered many of the same opinions Praxair is attempting to exclude.[3] However, Dr. Sconzert's deposition has not been taken because he is a non-testifying expert, subject to a protective order.[4]

**LAW AND ANALYSIS**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

---

[2] Supplemental Mem. Supp. 5, at 5-6 [doc. 67].

[3] Supplemental Mem. Opp. 2 [doc. 77].

[4] February 7, 2007 Mem. Ruling [doc. 76].

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 was amended in 2000 in response to the Supreme Court's rulings in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999). *See* FED. R. EVID. 702 advisory committee's note.

In *Daubert,* the Court set out several non-exclusive criteria for courts to consider in determining the reliability of expert testimony. The *Daubert* factors are: (1) whether the expert's theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (en banc) (citing *Daubert*, 509 U.S. at 593-95, 113 S.Ct. at 2796-97). The burden is on the proponent to prove by a preponderance of the evidence that the expert's testimony is reliable. *Moore*, 151 F.3d at 276.

In exercising its gatekeeping function, the court undertakes a two-part analysis: (1) whether the proffered testimony is reliable, which requires an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid (the *Daubert* factors); and (2) whether the testimony is relevant. *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (citing *Daubert,* 509 U.S. at 592-93, 113 S.Ct. 2796).

***Dr. Gary Kohler***

Dr. Kohler, a pulmonary specialist, was one of Carroll's treating physicians in the hospital and has seen him periodically since his discharge.[5] In a narrative medical report addressed to plaintiffs' counsel, Dr. Kohler indicated that Carroll has been diagnosed with neuropathy and suffers from chronic headaches and sleep disturbance.[6] Dr. Kohler stated that he feels "these are all sequelae of his significant and severe exposure to carbon monoxide and will be chronic conditions from this point forward."[7]

When deposed, Dr. Kohler confirmed his belief that the following are related to Carroll's exposure: neuropathy; sleep disturbance, with the exception of obstructive sleep apnea; dizziness; blurred vision; and possibly memory disturbance.[8] However, Dr. Kohler also testified that Carroll has neither restrictive nor obstructive lung disease as a result of CO exposure.[9] Nor did he believe there was objective evidence relating dyspnea to exposure.[10] As to sleep disturbance, Dr. Kohler indicated that the only way to distinguish between CO-related sleep disturbance and preexisting apnea would be to review sleep study results.[11]

Dr. Kohler testified that he would ultimately have to defer to Carroll's neurologist and

---

[5] Def.'s Ex. 4 (Kohler Report) at 44-45.

[6] *Id.* at 21-24.

[7] *Id.* at 25.

[8] Def.'s Ex. A (Kohler Dep.) at 52.

[9] *Id.*

[10] *Id.*

[11] Pls.'s Ex. 5 (Kohler Aff.).

ophthalmologist for a determination whether neuropathy and blurred vision were related to CO exposure.[12] He also suggested that a psychologist would have to test for memory disorders.[13]

However, in a post-deposition affidavit attached to the plaintiffs' Supplemental Memorandum in Opposition, Dr. Kohler elaborated on his deposition testimony.[14] In this affidavit, Dr. Kohler stated that he had reviewed sleep studies performed on Carroll and concludes, "The sleep disturbance caused related [sic] to the carbon monoxide exposure is the major component. The sleep apnea plays a minor role."[15] Dr. Kohler further concludes that the symptoms which he relates to CO exposure are: dizziness, blurred vision, neuropathy, headaches, memory disturbance, and sleep disturbance.[16] He notes that all of these symptoms are "well supported by medical literature as symptoms following carbon monoxide exposure."[17]

Thus, by affidavit, Dr. Kohler now offers a clear opinion regarding Carroll's sleep disturbance not offered at his deposition, based upon tests he had not previously reviewed. It is unclear, however, whether Dr. Kohler's affidavit repudiates his deposition testimony wherein he defers to other specialists on the cause of Carroll's neuropathy, blurred vision, and memory disorders.

---

[12] Def.'s Ex. A (Kohler Dep.) 52.

[13] *Id.*

[14] Pls.'s Ex. 5 (Kohler Aff.).

[15] *Id.*

[16] *Id.*

[17] *Id.*

Regardless, Dr. Kohler is board certified in internal, pulmonary, and critical care medicine.[18] He also testified that he has regularly seen carbon monoxide-exposed patients in his practice.[19] While Praxair has repeatedly cited *Moore v. Ashland Chemical Inc.*, Dr. Kohler's testimony, as it relates to his pulmonological findings, does not exhibit the same "analytical gap" as the expert's testimony in that case.

"[The purpose of *Daubert*'s gatekeeping requirement] is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. at 1176. On this basis, Dr. Kohler is well-qualified to testify to his findings as Carroll's pulmonary specialist and give opinions on causation as they relate to those findings. His testimony is both relevant and reliable. However, as Dr. Kohler has previously deferred to other specialists regarding neuropathy, blurred vision, and memory disturbance, he will not be permitted to testify as to whether these conditions were caused by CO exposure.

***Dr. Reynard Odenheimer***

Carroll was referred by Dr. Kohler to Dr. Odenheimer, who has served as Carroll's treating neurologist. When asked in his deposition whether Carroll had peripheral neuropathy caused by CO exposure, Dr. Odenheimer testified that he found no evidence that Carroll's peripheral neuropathy–

[18] Def.'s Ex. A (Kohler Dep.).

[19] *Id.*

also termed diabetic neuropathy[20]– was caused by CO exposure.[21] Dr. Odenheimer did indicate that testing revealed compressive neuropathies[22] which might have been caused by trauma when Carroll lost consciousness.[23] There is therefore no reliable evidence which supports the contention that CO exposure resulted in Carroll's peripheral neuropathy. If the CO exposure caused the unconsciousness then it might have caused the compressive neuropathy.

Praxair also seeks to exclude testimony from Dr. Odenheimer which suggests a causal connection between Carroll's exposure to CO and encephalopathy.[24] Praxair does not deny that there can be an association between CO exposure and encephalopathy, but, "from the standpoint of specific causation," it objects to causation testimony concerning encephalopathy in Carroll's case.[25] Praxair asserts two principal reasons why Dr. Odenheimer should be barred from giving such testimony. First, they argue that Dr. Odenheimer's diagnostic methodology is not supported by the scientific literature.[26] Second, Praxair asserts that Dr. Odenheimer's testimony is not consistent with

---

[20] *See* "Neuropathy" in STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

[21] Defs.'s Ex. B (Odenheimer Dep.), at 13-14.

[22]Compression Neuropathy: a focal nerve lesion produced when sustained pressure is applied to a localized portion of the nerve, either from an external or internal source; the main source of injury is the pressure differential that exists between one portion of the nerve and another. STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000).

[23] Def.'s Ex. B (Odenheimer Dep.), at 14.

[24] Encephalopathy: Any disorder of the brain. STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000). Also defined as "Disease of the brain in general." OXFORD ENGLISH DICTIONARY ONLINE (2007), *available at* http://dictionary.oed.com.

[25] Supplemental Mem. Supp. 12.

[26] *Id.* at 16.

Dr. Kohler's testimony.[27]

As to the first argument, Praxair contends that there was a discrepancy between Carroll's MRI and findings supported by the literature as common in CO-exposed individuals with delayed encephalopathy. Praxair asserts that when cross-examined on this point, Dr. Odenheimer replied that he had "not reviewed the medical literature pertaining to carbon monoxide and its relationship to neuroimaging.[28]

Nevertheless, Dr. Odenheimer testified that his finding of encephalopathy was not based solely on MRI images, but on two other objective criteria. First, Dr. Odenheimer explained that the fact that Carroll was comatose when he was admitted is clear evidence of encephalopathy.[29] Second, Dr. Odenheimer testified that the results of an electroencephalogram (EEG) were consistent with encephalopathy.[30]

Praxair takes issue with Dr. Odenheimer's first objective criterion, asserting that Dr. Kohler testified that Carroll was not comatose when he was admitted to the hospital. This argument mischaracterizes Dr. Kohler's testimony. Dr. Kohler stated, "[O]n my initial presentation he was not in a coma and never reached that point while I took care of him. *I don't know about before that*."[31] The plaintiffs argue that "the important point was that he was rendered unconscious...and it does not have any bearing on [Dr. Odenheimer's] opinion whether this occurred at the hospital or

---

[27] *Id.* at 15-16.

[28] Def.'s Ex. B (Odenheimer Dep.) 19-20.

[29] *Id.* at 14-15.

[30] *Id.*

[31] Def.'s Ex. A (Kohler Dep.) 29 (emphasis added).

in the ambulance as long as the history of unconsciousness is accurate."[32]

The plaintiffs attempt to reinforce this last point in Dr. Odenheimer's post-deposition affidavit. In the affidavit Dr. Odenheimer states:

> A further review of the medical records indicate [sic] that [Carroll] was unresponsive (comatose) in the ambulance. As the ambulance turned him over to the St. Pat's emergency room, he was becoming slightly responsive...The important point here is that he was unconscious, not where he was unconscious.[33]

It would appear that Dr. Odenheimer uses the words "unconscious" and "comatose" interchangeably. Thus, there is no clear indication that his testimony is inconsistent with Dr. Kohler's.

Also by his affidavit, Dr. Odenheimer attaches 18 articles in support of his diagnoses and in response to the following question:

> Do you have in your chart any material from the medical literature relating to the diagnostic criteria that are generally accepted in the field of neurology, for example for a diagnosis of a toxic encephalopathy following carbon monoxide exposure?[34]

Although Dr. Odenheimer's affidavit introduces new medical literature, it does not directly contradict his deposition testimony. Moreover, Praxair is free to cross-examine Dr. Odenheimer using any of this literature at trial. *See* FED. R. EVID. 803(18).

In sum, although Praxair may disagree with Dr. Odenheimer's diagnostic methods, such disagreement is not the proper basis for the exclusion of testimony on *Daubert* grounds. That there exists an alternative (or even better) method to reach a medical diagnosis does not mean that the method employed by the instant expert is unreliable. As such, Dr. Odenheimer will be allowed to

---

[32] Pls.'s Ex. 6 (Odenheimer Aff.).

[33] *Id.*

[34] Odenheimer Dep. 15.

offer testimony regarding the causal relationship between Carroll's encephalopathy and CO exposure. Considering that he previously testified that he found no evidence linking Carroll's peripheral neuropathy and CO exposure, but that his unconsciousness may have caused compressive neuropathies, Dr. Odenheimer will not be precluded from offering testimony consistent therewith.

***Dr. Earl Stagg***

Praxair asserts that the causal connection between CO exposure and diabetes was first suggested by Dr. Stagg in a letter to plaintiffs' counsel. In that letter, Dr. Stagg wrote, "I concluded that the steroid therapy and the stress of the exposure induced the diabetes."[35] However, they argue that Dr. Stagg's deposition reveals that such an opinion is not supported by the evidence and that Dr. Stagg conceded as much. As such, Praxair seeks to exclude any testimony linking Carroll's Type II diabetes to his exposure to CO.

Praxair explains that Carroll was a borderline diabetic before exposure and that Dr. Kohler put Carroll on steroids after the accident. They argue that the steroids elevated Carroll's glucose levels and that Dr. Stagg saw Carroll during the course of his steroid treatment. Praxair contends that Dr. Stagg conceded in his deposition that Carroll's blood sugar returned to its pre-exposure baseline when the steroids were discontinued. Thus, Praxair concludes that "the exposure caused no permanent or chronic change in Mr. Carroll's condition with regard to diabetes."[36]

The plaintiffs concede that Carroll may have been borderline or pre-diabetic prior to the accident. However, they argue that the steroids pushed Carroll's blood sugar into the diabetic range and that once in this range, as Dr. Stagg testified, he will be treated as a diabetic and it is unlikely

[35] Def.'s Ex. 5 (Stagg Letter).

[36] 2d Supplemental Mem. Supp. 4 [doc. 68]

that he will be able to maintain his blood sugar in the non-diabetic range for any significant duration.

As the Fifth Circuit noted in *Moore*, "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." 151 F.3d at 276. Dr. Stagg's diagnosis is based upon his professional experience and reliable medical tests. Thus, considering its relevance, there is no reason to exclude Dr. Stagg's testimony regarding the causal relationship between Carroll's diabetes and CO exposure.

***Dr. W.L. Iglinsky***

Based upon the testimony of Dr. Iglinsky, Carroll's ophthalmologist, Praxair argues that the court should forbid mention of blurred vision as a neurologic sequelae of Carroll's CO exposure. Praxair asserts that if Carroll's vision blurred as a result of exposure, there would have been detectable "optic atrophy." Praxair, though, points to Dr. Iglinsky's deposition, wherein he states that there was no optic atrophy and that he attributed Carroll's blurred vision more to eye dryness.

The plaintiffs argue that Praxair failed to include important testimony of Dr. Iglinsky. Specifically, they note that Dr. Iglinsky "testified that blurred vision is one of the affects that come [sic] from exposure to carbon monoxide...."[37] They also assert that Dr. Iglinsky testified that "there is a significant part of the optic nerve that you can't observe" and that Carroll could have an injury there.[38] Unfortunately, neither the plaintiffs nor the defendants provided the court with copies of this particular testimony.

Nowhere has Dr. Iglinsky's methodology or reasoning been challenged as unreliable. Moreover, nowhere is it disputed that his testimony is relevant. Consequently, there is no reason to

---

[37] Supplemental Mem. Opp. 6.

[38] Id. at 6.

preclude Dr. Iglinsky from testifying on *Daubert* grounds.

Accordingly, Praxair's Motion in Limine to Exclude Unreliable Expert Testimony will be denied.

Lake Charles, Louisiana, this 23 day of February, 2007.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE